UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | Criminal No. 2:14-CR-00009-NT |
| ) | |
| **FRITZ BLANCHARD** ) | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The Government provides this memorandum to address issues it anticipates for sentencing, including enhancements for obstruction of justice and role in the offense.

**A. Enhancement for Obstruction of Justice**

The Government advocates a two-point enhancement for obstruction of justice under U.S.S.G. §3C1.1, based on Defendant's trial testimony. The Court may impose the enhancement if it finds, by a preponderance of the evidence, that Defendant has committed the specific elements of perjury. United States v. Gonzalez, 609 F.3d 13, 20 (1st Cir. 2010), citing United States v. Shinderman, 515 F.3d 5, 18-19 (1st Cir.2008). Perjury means "false testimony under oath concerning a matter material to the proceeding, as long as the testimony is given 'with the willful intent to provide false testimony.'" Shinderman, 515 F.3d at 19 (quoting United States v. Dunnigan, 507 U.S. 87, 94 (1993)).

In making the perjury finding, the Court should review the evidence and make independent conclusions necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same. Dunnigan, 507 U.S. at 95. Where a district court finds that a defendant has fabricated his entire testimony, the court need not delineate every specific instance in which the defendant lied. United States v. Diaz, 670 F.3d 332, 351-352 (1st Cir. 2012). The district court's determination is sufficient if the court makes a finding of an obstruction of, or

1

impediment to, justice that encompasses all of the factual predicates for a finding of perjury. Dunnigan, 507 U.S. at 96 (upholding imposition of enhancement for perjury where trial court found "that the defendant was untruthful at trial with respect to material matters in this case. [B]y virtue of her failure to give truthful testimony on material matters that were designed to substantially affect the outcome of the case, the court concludes that the false testimony at trial warrants an upward adjustment by two levels.")

To assist the Court in determining that the obstruction enhancement is appropriate in this case, the Government has reviewed the trial record and compiled the following summary comparing Defendant's testimony on a few key issues with the balance of the evidence adduced at trial.

### 1. Creation of Backpage Ad for Alisha Philbrook

**Evidence Adduced at Trial:** Samuel Gravely testified that Defendant first raised the issue of prostitution with him, Trial Transcript Volume 1, page 11, 120 (T1:11, 120), and that they had conversations about it thereafter. T1:22. Defendant said he had women working for him at the time. T1:22. Defendant was aware of Gravely's prostitution arrangement with Alisha Philbrook. T1:26. As Gravely testified, "He put me on with it, so, you know, we talk about everything we did." T1:26. Gravely also testified that Defendant was present for both trips to Bangor where Philbrook worked as a prostitute. T1:27; 48. "We did everything together," Gravely said. T1:27. While Philbrook was seeing customers, he and Blanchard waited in car in parking lot. T1:47; 51.

Gravely further testified that Defendant told him about Backpage, T1:36, 110, 120, which Gravely had never used before. T1:110. After Gravely took photos of Philbrook, Defendant helped him write and post a Backpage ad advertising her availability for escort services.

Defendant picked the title for the ad, T1:42, wrote the description, and showed Gravely how to post it, T1:35, 121, and pay for it. T1:46.  When they wrote the ad, Gravely and Defendant worked together to avoid using any information that would come back to them. T1:44.  Gravely positively identified the Backpage ad that he and Defendant posted of Philbrook. T1:36; Government's Trial Exhibit 1 (GX 1).

     Alisha Philbrook testified that although Defendant wasn't present for the initial conversation she and Gravely had about prostitution, he was there for later ones. T1:133.  Defendant came with her and Gravely on their first prostitution trip to Bangor. T1:134.  Both men went into the hotel to rent a room. T1:134.  Philbrook believed that Gravely and Defendant talked with her about working as a prostitute before Gravely took pictures of her for a Backpage ad. T1:137.  Defendant was not there when Gravely took pictures of her; he left because she was uncomfortable having him in the room, T1:137, but returned shortly thereafter. T1:136.  As soon as Gravely had taken the pictures, he and Defendant left to post the ad. T1:136.  When they returned, Gravely showed her the ad they had posted. T1:137.  Defendant was there when he did so. T1:138.  Philbrook testified that the photos in the Backpage ad, GX 1, were taken at the Motel 6 in Bangor during their first weekend trip to Bangor, at which Defendant was present. T1:139.

     **Defendant's Testimony:** Defendant acknowledged that he had met Philbrook, T3:112, and knew that she Philbrook was working as a prostitute for Gravely. T3:115.  He further acknowledged that he was with Gravely while Philbrook was working as a prostitute. T3:115.  He denied, however, that he ever told Gravely about making money through prostitution, T3:112, 115, and claimed he had nothing to do with the prostitution relationship between

Gravely and Philbrook. T3:116.  He further denied that he ever helped Gravely write or post a Backpage ad for Philbrook. T3:116.

### 2.  Creation of Backpage Ad for MJ

**Evidence Adduced at Trial:** Gravely testified that after he and Defendant met MJ and brought her back to the hotel room, Defendant took photos of her, T1:59, wrote the description for a Backpage ad, T1:68, chose the title for it, T1:67, and posted the ad at the Travelodge Hotel in Portland. T1:59, 66-67; 122.  He identified the photos in the Backpage ad of MJ (GX 2) as the ones Defendant took at the Travelodge in Portland. T1:60.  He further testified that although the e-mail address in the ad was Philbrook's, the phone number was Defendant's. T1:68.

Gravely also testified that MJ saw customers at the Travelodge after the Backpage ad was posted. T1:68.  Around the time the ad was posted, he heard conversations between Defendant and MJ about prices, how to talk on phone, etc. T1:68.  While MJ was working as a prostitute, he, Philbrook and Defendant waited in the car. T1:68.  Defendant got the money MJ earned. T1:123.

Philbrook testified that Defendant and MJ had the same kind of relationship that she had with Gravely, stating "It was quite apparent that it was kind of like what me and Bigs were doing." T1:159.  She recalled that after running an errand, she returned to the Portland hotel room and saw MJ topless on the bed. T1:159.  Defendant was in the room with her. T1:159.  Philbrook believed that Defendant was taking pictures. T1:159.  The photos in the Backpage ad (GX 2) do in fact depict MJ topless on the bed in the hotel room.  The Backpage ad was posted from an IP address registered to the Travelodge in Portland (GX 20) where Defendant had rented a room. GX 22.

**Defendant's Testimony:** Defendant testified that Gravely invited MJ back to the hotel room. T3:123.  He denied that he ever took pictures of her. T3:143.  He further denied that he posted the Backpage ad of MJ. T3:144.  Finally, he denied that MJ saw customers at the hotel, and denied that she gave him the money she earned. T3:144.

### 3. Use of 857-939-5290 Phone

**Evidence Adduced:** Gravely testified that Defendant used the nickname Shake. T1:10.  He further testified that 207-272-3032 was the cell phone he was using at the time of the offense, T1:92, and that the 857-939-5290 phone number listed in the Backpage ad for MJ was Defendant's phone. T1:68.  He also testified that he and Defendant were in contact by phone virtually every day. T1:20.

Kaylee Howland testified that she heard Defendant call MidTown Hotel from the car on their way to Boston. T2:75.  She also saw Defendant give his phone to MJ to answer when it rang in the car. T2:107.  She further recalled that Defendant had given his phone to MJ to use later in the evening while Howland, Philbrook and Defendant were out walking on the street in downtown Boston. T2:108.

Chris Fitzpatrick testified that the subscriber information for phone number 857-939-5290 (GX 21(c)) showed that the phone was registered to Shake Julien. T3:48.  The subscriber information listed the user's address as 044 Harrison Avenue, T3:48, an address similar to the one Defendant had used on several other occasions, including on the guest registration records for the Travelodge (GX 22) and on his Massachusetts state identification card (GX 12). T3:49.

Agent Fitzpatrick further testified that the call records from 857-939-5290 showed 23 calls from that number to the number registered to Defendant's mother between March 19 and March 29, 2013, including seven calls on day of offense. T3:66.  The call records reflected no

calls between 857-939-5290 and the numbers associated with Gravely's mother, Philbrook's mother or Howland's mother. T3:68.

Agent Fitzpatrick also testified between March 15 and March 31, 2013, the call records for 857-939-5290 showed 196 contacts with 207-272-3202, Gravely's number. T3:69.  They also show a call to MidTown Hotel on 3-28 at 1:55 p.m. T3:70.

The Backpage ad for MJ, (GX 2), lists the number 857-939-5290.

**Defendant's Testimony:** Defendant acknowledged that he used the nickname Shake, T3:110, and that he had lived at 444 Harrison Avenue. T3:107.  He claimed, however, that the 857-939-5290 cell phone belonged to Gravely, T3:140, and that he only ever used it when Gravely loaned it to him so he could call his mother. T3:132.  He claimed that any calls between the 857-5290-5290 phone and his mother's home number were probably Gravely trying to reach him while he was home. T3:142.

### 4.  Purpose for Walking Trip in Downtown Boston

**Evidence Adduced:** Gravely testified that he and Defendant decided to drive with the women to Boston because business was slow in Portland. T1:70.  When they arrived, they drove to Defendant's family home in Dorchester, where they tried to post Backpage ads of Philbrook and MJ. T1:77.  When they were unsuccessful posting the ads, it was Defendant's idea to put women out on the track. T1:79, 123.  Defendant was familiar with the area, T1:79, and went to the track with the women because it was more his deal, he knew what to do. T1:82.

Alisha Philbrook testified that a little after 5 p.m. on the day of the offense, she, Howland, Gravely and Defendant drove from the Boston hotel to a downtown area, where Gravely dropped her, Howland and Defendant off. T2:9.  Gravely told her and the "skinny girl" that Defendant was going to bring them up to speed on what was going on. T2:9.  After they

6

walked around for an hour or so, then walked over a bridge to an area that Defendant told them was the strip. T2:12.  He told them they were supposed to walk back and forth around the block, and "get into vehicles and do stuff for people – well, customers." T2:12.  Defendant was telling them what they were supposed to do; Gravely was already gone. T2:12.  While they were walking, Blanchard told her to show the new girl "how to do it, to walk around and get in a vehicle and show her how to proceed." T2:13.  When she didn't, Defendant told her to walk ahead so he could speak to Howland privately. T2:14-15.  He and Howland talked privately for 30 minutes or so. T2:15.  Gravely picked them back up again around 7 or 8 p.m. T2:24.  She did not know how he knew to come and get them. T2:24.

Kaylee Howland testified that Defendant seemed familiar with area and had friends there. T2:87.  He told her and Alisha where to walk and what to do. T2:86.  While they were on the street, Defendant started explaining to her what an escort was. T2:86.  As he was explaining, he told her to watch Philbrook and learn from her. T2:88.  He then gave Howland specific instructions about how much to charge, what specific sex acts to perform, how and where to walk. T2:90.  He told her they were there to make money and that she was to give any money she earned to him. T2:91.  Howland also testified that while Defendant was giving her these instructions, Philbrook was walking ahead of them. T2:91.

Howland also testified that while they were out walking on the street, she repeatedly texted her friend Kayla Warren to say she was scared and had gotten herself into trouble. T2:92.  While they were on the street, Defendant bought them condoms at a convenience store. T2:92.  When the batteries on their cell phones ran low, they decided to return to the hotel, but Defendant said they would go back out after they had recharged their phones. T2:94.

7

Gravely, Philbrook and Howland all identified hotel surveillance photos showing Defendant and Gravely walking to the hotel garage at 5:31 p.m. (GX 15(k) and 15(l), respectively); Howland and Philbrook walking to the hotel garage at 5:39 p.m. and 5:40 p.m., (GX 15(q) and 15(r), respectively); and the vehicle leaving the hotel garage at 5:46 p.m., after Howland retrieved a working passkey for the garage gate. GX 15(u). All three witnesses also identified hotel photos showing them returning from the strip with Defendant at 8:36 p.m. GX15(v).

Phone records associated with Howland's phone show an ongoing text exchange between her and Kayla Warren, including texts that Howland sent at 6:09 p.m. stating "I think I might have gotten myself into trouble" and three texts stating "I'm scared" that she sent between 6:09 p.m. and 8:58 p.m. GX 24(b)(2).

**Defendant's Testimony:** Defendant testified that when he, Philbrook and Howland went to downtown Boston, they were sightseeing. T3:129. He admitted having a private conversation with Howland, but said it was at Howland's request. T3:130. He denied that he ever talked with Howland about being an escort. T3:131.

It is the Government's position that in the face of all the other evidence adduced at trial, Defendant's general denials of any involvement whatsoever in prostitution justify the conclusion that he gave knowing false testimony at trial. More specifically, his testimony on these particular issues satisfies the elements of perjury and warrants an enhancement for obstruction of justice.

B.  **Enhancement for Role in the Offense**

The Government also advocates a two-level enhancement for Role in the Offense pursuant to U.S.S.G. §3B1.1(c). To apply the 2-level adjustment in §3B1.1(c), the Court must first conclude

that the defendant was involved in a "criminal activity" that involved at least two participants -- the defendant and another person. See USSG §3B1.1, comment. (n.2); United States v. Williams, 527 F.3d 1235, 1249 (11th Cir. 2008).

The Court must then determine whether the defendant was an organizer, leader, manager, or supervisor in the criminal activity, considering not only the offense conduct, but all relevant conduct attributable to him under §1B1.3.2. "The line between being an organizer or leader, on the one hand, and a manager or supervisor, on the other, is not always clear []." United States v. Bahena, 223 F.3d 797, 804 (8th Cir. 2000)(citing United States v. Delpit, 94 F.3d 1134, 1155 (8th Cir. 1996)). The difference turns on the defendant's degree of responsibility in the criminal activity. See USSG §3B1.1, comment. To distinguish leaders and organizers from mere managers and supervisors, the Court should consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

USSG §3B1.1, comment. (n. 4). The Court need not find that all of these factors are present. United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995).

To qualify as "organizer or leader," the defendant must have exercised a significant degree of control and decision making authority over the criminal activity. By contrast, to be a manager or supervisor, the defendant need only "have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime." United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir. 1990).

9

With respect to smaller criminal activities that involve fewer than five participants or are not otherwise extensive, "the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility." U.S.S.G. §3B1.1, Background.  The enhancement may apply where the defendant recruited and exercised control over just one other accomplice. United States v. Solorio, 337 F.3d 580, 601 (6th Cir. 2003)( district court properly concluded that defendant was a "supervisor" in where he recruited and exercised control over just one accomplice by directing that accomplice's drug activities).

Moreover, more than one person may qualify as an organizer or leader of a criminal activity. *See* United States v. Vallejo, 297 F.3d 1154, 1169 (11th Cir.2002) ("The defendant does not have to be the sole leader or kingpin of the conspiracy in order to be considered an organizer or leader within the meaning of the Guidelines.").

By returning a verdict of guilty against Defendant, the jury concluded that Defendant was involved in the transportation of women in interstate commerce for prostitution, as charged.  At the sentencing of Samuel Gravely (Criminal No. 2:13-CR-191-NT), this Court found that the criminal activity involved four participants (Gravely, Defendant, Philbrook and Howland).  The remaining question, then, is whether Defendant can fairly be characterized as a leader, organizer, manager or supervisor of the criminal activity.

Here, the record supports the conclusion that Defendant and Gravely were partners in prostitution.  Defendant knew that Philbrook worked as a prostitute for Gravely, helped Gravely post a Backpage ad listing her availability for escort services in Bangor, and waited with him while she saw customers.  Together, they decided to drive south because business was slow in Bangor.

In Portland, Defendant and Gravely together recruited MJ.  They then drove her back to the hotel room Defendant had rented, where Defendant took photos of her there, posted a Backpage ad of her listing his own phone number, was present while she saw customers, and got the money she earned.  He was also present when Kaylee Howland was recruited and participated in the conversation inviting her to Boston.  He then drove with Gravely and all three women from Portland to Boston, reserving a hotel room in Boston along the way and paying for it from his own bank account.

In Boston, he and Gravely attempted to post ads for two of the women, listing their availability for escort services in the Boston area.  When that was unsuccessful, he conceived the idea to take the women to the "track," then escorted two of them there for several hours, showing them where to walk and telling them how to act, what sexual acts to perform and how much to charge.  He instructed one of the women to give him the money she earned.

This record adequately supports the conclusion that Defendant was at least a manager or supervisor of the criminal activity, and is therefore subject to a two-point role in the offense enhancement.

Dated:  January 13, 2015                               Respectfully submitted,

                                                       THOMAS E. DELAHANTY II
                                                       United States Attorney

                                                       BY:  /s/  GAIL FISK MALONE
                                                       GAIL FISK MALONE
                                                       Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2015, I electronically filed the Government's Memorandum in Aid of Sentencing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Joel Vincent, Esq., at jvincent802@gmail.com

>Thomas E. Delahanty II
>United States Attorney
>
>BY: **/s/ Gail Fisk Malone**
>
>Gail Fisk Malone
>Assistant United States Attorney